## STATE v RIDGEWAY

Ohio Appeals, 9th Dist, Summit Co.

No. 3142. Decided April 27, 1939.

Alva J. Russell, Pros. Atty., Akron, and Robt. I. Azar, Asst. Pros. Atty., Akron, for appellee.

Gottwald, Breiding & Hershey, Akron, for appellant.

**OPINION**

By DOYLE, J.

The appellant, the defendant in the trial court, stands convicted of the crime of manslaughter in the second degree, §12404-1 GC. This code section upon which the indictment was based provides that:

"Whoever shall unlawfully and unintentionally kill another while engaged in the violation of any law of this state applying to the use or regulation of traffic on, over or across the roads or highways shall be guilty of manslaughter in the second degree and shall be fined * * *."

It was charged in the said indictment that, as a proximate result of the violation, by the defendant, of certain penal statutes of the state of Ohio, the deceased, Mary Pastor, came to her death within the time limit prescribed by statute. Specifically the defendant was charged with a violation of the following penal statutes:

1. **Sec. 12603 GC,** in that he did operate a motor vehicle upon a certain street or highway located in the city of Akron at a speed greater than was reasonable or proper under the circumstances then existing.

2. **Sec. 12603-1 GC,** in that he did operate his automobile upon an Akron street without due regard for the safety and rights of pedestrians, and drivers and occupants of other vehicles and so as to endanger the life, limb and property of such persons while in the lawful uses of the street or highway.

3. **Sec. 6296-30 GC,** in that he did operate his automobile upon an Akron street while under the influence of alcohol.

The prosecution presented evidence which tended to prove that on the 2nd day of July, 1938, between the hours of 8:30 and 9 P. M., the defendant, William Ridgeway, was operating a Ford Coach Sedan automobile, and was proceeding in an easterly direction on Emerling Avenue in the city of Akron, Ohio; that at the intersection of Emerling Avenue with Grant Street, which latter street runs in a northerly and southerly direction, the defendant, not stopping for north or south bound traffic, operated his automobile into and upon Grant Street and almost struck an automobile driven by one Jack Shirley, who, to avert a collision, swerved his automobile sharply to the left, and brought it to a stop in close proximity to the defendant's car which had been likewise stopped. Mr. Shirley, according to his testimony and that of his wife, then stepped out of his car and proceeded to the defendant's car a few feet away. The defendant was sitting in a "slumped condition." A conversation then took place between Mr. Shirley and the defendant in the presence of Mrs. Shirley, who was riding with her husband. Both Shirley and his wife testified that Ridgeway, the defendant, was drunk at that time.

After a heated conversation between Mr. Shirley and the defendant, the former proceeded to a gasoline station in the immediate vicinity for the purpose of calling the police by telephone. The defendant thereupon started his automobile and drove in a northerly direction on Grant Street. His course was zigzag and irregular. The testimony showed this event to have occurred at approximately 8:40 P. M.

Subsequently, after the time of the fatal accident to Mary Pastor and after the arrest of the defendant, the Shirleys identified the defendant as being the same person with whom they had had the altercation at the corner of Emerling avenue and Grant street.

The evidence further developed the fact that shortly after 8:40 p. m. on this same night, a person, unknown at the time, while operating an automobile, the description of which corresponded to the car owned by the defendant, Ridgeway, proceeded northerly on Grant street at a rate of speed variously estimated at between 40 and 60 miles an hour, and that as the car was operated immediately beyond the intersection of Stanton avenue and Grant street, it struck Mary Pastor, the deceased, who, with her sister, Mrs. Julia Bartos, was crossing Grant street from the east to the west side thereof.

The testimony of the sister, Julia Bartos, was to the effect that, as they crossed the street (Grant street), she (the witness) looked to the south and saw an automobile about a block away coming in a northerly direction; that they proceeded to the center of the street and then waited until an automobile proceeding in a southerly direction had passed them, and at that moment, while her sister was standing on the yellow line which marked the center of the pavement, she was struck by the automobile which was going north.

Another witness, Clarence Ruble, testified that he saw the car strike the deceased; that it struck her after she had proceeded beyond the center line of the street onto the west side thereof; that it was traveling at the time at a rate of speed of between 45 and 50 miles an hour; and that after the accident it proceeded on without stopping.

State's witness Ray Palmerini testified that he was in the immediate vicinity of the accident; that he did not actually see the car strike the woman, but that he heard the crash and saw the glass fall out of the left headlight, and the headlight rim fall to the ground; that the car was being driven at a rate of speed of between 40 and 45 miles an hour, and that after the collision the speed of the car was accelerated.

Other witnesses for the state testified that they saw the northbound car; one of them said "a car came down the road and straddled along the yellow line, and I only seen a woman, and it seemed like this car hit her, and that's all I could say." The headlight rim and glass were identified by various witnesses as the same which came from the car involved in the accident.

The evidence later revealed that Mr. and Mrs. Shirley arrived at the scene of the fatal accident approximately 15 minutes after the time of the altercation between Mr. Shirley and the defendant, Ridgeway, heretofore mentioned. When they learned that an accident had just occurred, they told the police officers of their experience a few minutes before with a drunken driver a short distance south on Grant street, and gave to them the license number of the car which he was driving. The number corresponded to the one issued by the state of Ohio to the defendant, Ridgeway.

Officers then proceeded to the defendant's home, and in a conversation inquired of him where he had been that evening. At first he stated that he had not driven his car, but later admitted that he had driven it that afternoon and evening and had arrived home about 9 p. m. Upon inquiry as to the whereabouts of the car, he told them that his wife had taken it temporarly. The officers then awaited her return. During this interval, the defendant became abusive, and ordered the officers out of his home, whereupon they left and sat in a police cruiser parked immediately in front of the home while awaiting the return of the wife.

When the defendant discovered that the officers had not gone, he came from his house, waved a shotgun at them, and insisted upon their leaving. Subsequently, other officers came and again the defendant became insulting and abusive. He was then arrested. His resistance to the arrest was such that the police were compelled to forcibly

take him to their car. In the altercation, the defendant bit one of the police officers. The evidence disclosed that at this time the defendant was in an extreme state of intoxication.

Upon the return of the defendant's car by his wife, an examination of it revealed a damaged left front headlight, several dents, scratches, and a fresh tear in the left front fender. Officer Cletus McGuckin testified:

"Q. And will you please tell this jury what that examination disclosed?

"A. The left front headlight was without any glass, any lens, and any rim. There was a rubber band around the headlight to hold the reflector in place. We found several dents and scratches on the left front fender. There was a tear in the fender."

The testimony later revealed that the glass from the headlight of the car which was involved in the accident was similar to and of the same design as the glass in the headlight of the defendant's car, and that the headlight rim picked up at the scene of the accident fit into the headlight of defendant's car.

The evidence further developed that certain material was found "in the crease where the fender (of the defendant's car) had been torn," and upon examination was discovered by the witness Dr. Eugene E. Ecker, a pathologist of Cleveland and an associate professor in the School of Medicine of Western Reserve University, to contain a fatty substance, and wool and rayon fibre threads. The threads corresponded, according to the evidence, to the rayon and woolen fibre of certain garments worn by the deceased, Mary Pastor, at the time she was injured.

The foregoing recital of the evidence epitomizes the evidence of the state. The defendant did not take the witness stand in his own defense, and the testimony ruled competent and given by witnesses called on behalf of the defense, was of little assistance in assisting the jury in a determination of the facts.

While it must be conceded that no one identified the accused as the driver of the car which struck Mary Pastor, and caused the injuries from which she died, yet the proven facts and circumstances were such as not to be susceptible of explanation upon any reasonable hypothesis consistent with the innocence of the defendant.

Consistent with the Supreme Court of Ohio in **Scaccuto v State of Ohio, 118 Oh St 397**, we reaffirm the principle of law that "In a criminal prosecution, questions of fact are for the jury, and a judgment of guilty will not be reversed as not sustained by sufficient evidence unless the verdict and judgment are clearly and manifestly contrary to the evidence." In the case at bar, the judgment is not against the weight of the evidence.

Numerous assignments of error are urged by the defendant:

It is claimed that the court erred in permitting police officers to testify to the defendant's condition of inebriation, and to his conduct at the time of his arrest, fully an hour and more after the fatal accident.

This testimony was admitted by the trial court on the theory that it tended to substantiate the claim of the state that the defendant operated his automobile at the time of the fatal accident while under the influence of alcohol, there being evidence in the record that he was intoxicated while in his machine in the vicinity of the accident a few minutes before.

The jury was charged on this subject in the following language:

"The court has allowed in evidence testimony of witnesses purporting to describe the actions of the defendant, and to give conversations of the defendant at his home and elsewhere both before and after the alleged happening of the matters which the state claims occurred at Grant street and Stanton avenue. This testimony was allowed and will be considered by you for whatever bearing it has, if any, upon the claim of the state that the de-

fendant was operating a motor vehicle as claimed by the state at Grant street and Stanton avenue while under the influence of alcohol, **and for no other purpose.**" (Emphasis ours).

Likewise during the course of the trial the court limited this evidence in a similar manner.

While there is no legal presumption that the defendant's intoxication preceded the time when it was first observed by the police officers, which was subsequent to the accident, the evidence was competent for consideration by the jury, along with other evidence of his intoxicated condition immediately preceding the time of the fatal accident, for the purpose of determining whether or not he was at the time of the accident under the influence of alcohol.

It is further urged that the court erred in refusing to allow counsel for the defendant to cross-examine one of his own witnesses, Richard Harding. It appears that Harding was offered as a defense witness. His testimony revealed that he was the driver of the southbound car which passed the two women at the time of the accident. A part of his testimony follows:

"Q. When you last saw the women they were near the center of the street, is that right?

"A. That's right.

"Q. Now, what happened following the last time you saw them?

"A. I was proceeding on south. I was intending to make a right hand turn onto Stanton avenue. There was a car coming north and I had already passed the women. I had started past them when the car from the north came through and passed me.

"Q. Then you didn't see anything?

"A. I didn't see anything.

"Q. You may state whether or not any part of your car came in contact with any of these two women?

"A. I don't know."

Following this testimony counsel for the defendant requested of the court the privilege of cross-examining this witness. The record shows the following:

"Mr. Gottwald: Now, as I indicated to the court before I produced this witness, he is evidently hostile.

"The Court: I don't see any showing of hostility yet. He has answered every question without hesitation.

"Mr. Gottwald: But in answer to the last question as to whether any part of his car had struck this woman or either woman, he said he didn't know. Now this witness has stated to two other witnesses that his car did strike one of these women. He said it out there that night at the scene of the collision. He also said to one witness that his car was clipped by the north bound car.

"Witness: I did not.

"Mr. Gottwald: Just a minute, I want to ask those questions of him to lay foundation for showing contrary statements outside of court.

"The Court: Are you willing to answer these questions?

"Witness: Yes, sir."

Thereupon, the attorney for the defendant insisted that the witness was hostile, and requested the right to ask him certain questions concerning statements which he was alleged to have made to other persons to the effect that he had struck, with his car, Mary Pastor, the deceased. Specifically Mr. Gottwald said to the court:

"I want to ask those questions of him to law foundation for showing contrary statements outside of court."

It is apparent to the members of this court from a careful reading of the record that the only conclusion which can be reached is that it was the intention of counsel for the defendant to attempt to lay a foundation for impeachment and to later introduce witnesses to impeach the witness.

The Supreme Court of Ohio in **State of Ohio v Duffy, 134 Oh St 16,** pronounced the following rule:

"1. When a witness has voluntarily made a written statement, under oath, as to the existence of a state of facts, the party calling him may, in the absence of an express forewarning from the witness of an intention to repudiate it and notwithstanding knowledge of his hostility, rely upon such statement and expect his testimony to be in accord therewith; and if his testimony is in direct contradiction thereto as to a material fact, such party will be deemed taken by surprise as a matter of law.

"2. When taken by surprise by the adverse testimony of its own witness, an accomplice of the accused, the state may interrogate such witness concerning his prior inconsistent sworn statement, made in or out of the presence of the accused, for the purpose of refreshing the recollection of the witness, but not for the purpose of offering substantive evidence against the accused."

Likewise, in **Hurley v State, 46 Oh St 320**, the rule is:

"1. A party who calls a witness, and is taken by surprise by his unexpected and unfavorable testimony, may interrogate him in respect to declarations and statements previously made by him, which are inconsistent with his testimony, for the purpose of refreshing his recollection, and inducing him to correct his testimony, or explain his apparent inconsistency; and for such purpose his previous declarations may be repeated to him, and he may be called upon to say whether they were made by him.

"2. In case a witness denies having made such statements, or his answer is ambiguous concerning them, it is not competent for the party calling him, to prove them by other witnesses."

There is nothing in the present record to show that counsel for the defendant was taken by surprise or that his witness testified in any manner inconsistent with that which counsel expected when the witness was called. The following extract from the record indicates the attitude of defense counsel toward this witness:

"The first witness who will be offered for the defense is a young man named Richard Harding, who formerly lived * * * out near Kenmore Boulevard. I want to say that I offer this witness, but I will not be responsible for what he says, and if he proves hostile, or if he takes advantage of his constitutional right not to testify in a manner that would tend to incriminate him, I have the right to impeach him under the general rules of procedure."

Under the circumstances of this case, it was not permissible for the defendant to lay a basis for the impeachment of his witness Harding, nor was the proffered impeachment testimony of certain defense witnesses competent. There is nothing in the record to indicate that at any time were any questions propounded to the witness with the intention and for the purpose of refreshing his recollection as to statements which the defense claimed he had made prior to the trial to various persons who were later called for impeachment purposes. The entire strategy of the defense counsel was directed toward the impeachment of the witness for whom he specifically refused to vouch, even before he was offered as a defense witness. It is settled law in Ohio that under no circumstances can one impeach the testimony of his own witness by proof from other witnesses that he has made statements inconsistent therewith.

It is further claimed that the court erred in refusing to charge the jury on certain questions of law, requested orally by counsel for the defense at the conclusion of the general charge of the court. Request was made to charge the following:

"That if the jury find that the decedent * * * was negligent in any respect, and that her negligence was the sole, direct and proximate cause of the injury she received, the jury must re-

turn a verdict in favor of the defendant "

The court had already charged in effect that the unlawful acts relied upon as a predicate for the crime of manslaughter must be the proximate cause of the death, and that that proposition must be proved beyond a reasonable doubt.

As we view the record, there was no evidence tending to prove that any act of the deceased was the **sole** proximate cause of her death. The most that could possibly be claimed for the evidence is that she might have been contributorily negligent. And even as to such a claim, the evidence is neither convincing nor compelling.

Under such circumstances we hold that it was not error to refuse to give the charge requested.

We have examined the other errors assigned, including the other requests to charge, and we find no error prejudicial to the substantial rights of the appellant in connection therewith.

Judgment affirmed.

WASHBURN, PJ. and STEVENS, J., concur.